KAZEN, District Judge,
concurring in part and dissenting in part.
Although I concur in most of the majority opinion, I respectfully dissent from the decision to grant Captain Richardson qualified immunity on McCreary’s Fourth Amendment claim. Reading the factual record in the light most favorable to McCreary, I believe he has sufficiently demonstrated a genuine issue of material fact regarding whether the public strip search was justified. Thus, summary judgment was improper. I would reverse and remand for further proceedings on that claim only.
I.
A.
Starting with the second step of the qualified immunity inquiry, the majority concludes that Captain Richardson did not act in an objectively unreasonable manner in conducting a public strip search because he was responding to “potentially inflammatory statements in a hallway full of a hundred prisoners.” Thus, the majority finds that the strip search was a justified response to a “disturbance” created by McCreary. I disagree with that conclusion because it unduly credits Captain Richardson’s sparse and contradictory version of events in analyzing whether he violated clearly established law.
In conducting the second step of the qualified immunity inquiry on summary judgment, we are to determine the issue of clearly established law under the plaintiff’s version of events. See, e.g., Ramirez v. Martinez, 716 F.3d 369, 378-79 (5th Cir.2013). McCreary furnished a detailed retelling of the incident with Captain Richardson, much of which is contained in the majority opinion.
By contrast, in response to McCreary’s initial administrative grievance in the prison, Richardson supposedly reported that McCreary became “disruptive” during his “opportunity to go to his religious service.” That response mentioned nothing about a strip search, but rather stated that McCreary was sent back to ,his assigned housing and could return when he “decided to follow orders.” The response concluded: “No further action • warranted.” Curiously, this information did not come directly from- Richardson. Instead, as noted in the Magistrate Judge’s Report and Recommendation, it came in a response signed by Warden Wisener who purportedly received the information from Richardson. The only other input allegedly from Richardson, but signed only by his state attorneys, came in an “Advisory to the Court.” This was described as a response to an order from'the Magistrate Judge requiring Richardson to specify whether the strip search of McCreary “was the product of a specific unit post order, unit departmental policy or upon belief of a supervisor that there was reasonable cause to warrant such a search.” (R. at 69.) The Advisory cited a prison rule, AD 3.22, that “allows a supervisor, such as [Richardson], to call for a strip search when he or she believes there was reasonable cause for such,” but provides no explanation of what constituted reason *662 able cause (nor is rule AD 3.22 in the record). Notably, Captain Richardson never submitted any personal affidavit or testimony to support his version of the incident.[1]
On the record before us, the only “disruption” by McCreary was two questions posed early in the encounter that requested the reasons for Captain Richardson’s mistreatment and general dislike of Muslims. I do not think this record supports a safety purpose for the strip search. Since Captain Richardson is virtually silent in this record, there is no evidence that McCreary acted in a threatening manner, had been tagged as a high-risk prisoner, or otherwise posed a security threat. Notably, there is also no evidence that McCreary attempted to incite misbehavior by the other prisoners in the hall nor that any disruption occurred.
B.
It is clearly established that a prison official, like Captain Richardson, must have reasonable justification for initiating a strip search. See Moore v. Carwell, 168 F.3d 234, 237 (5th Cir.1999) (citing Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)). It is true that we give substantial deference to prison strip searches when they are based on legitimate penological interests or institutional safety requirements. See Moore, 168 F.3d at 236-37; Watt v. City of Richardson Police Dept., 849 F.2d 195, 196 (5th Cir.1988). But when the search cannot be justified on those grounds, we hold it to be unreasonable. See Waddleton v. Jackson, 445 Fed.Appx. 808, 809 (5th Cir.2011) (unpublished) (applying clearly established law and holding that the plaintiff sufficiently alleged Fourth Amendment violation where there was “no justification, pe-nological or otherwise,” for the strip search conducted); see also Cooke v. Nealy, No. 97-21035, 1998 WL 912177, at *3 (5th Cir. Dec. 16, 1998) (unpublished) (applying clearly established law and holding that plaintiffs direct evidence of a non-routine, retaliatory strip search was sufficient to state a valid, non-frivolous claim). Here, even giving the requisite deference to a prison official’s decision to strip search a prisoner, McCreary has presented credible evidence that an “irate” Captain Richardson publicly strip searched him without a “legitimate penological need[ ]” or meeting any institutional safety requirement. See Moore, 168 F.3d at 236-37.
The cases cited by the majority to support a lack of clearly established law are inapposite. Precedent dismissing facial challenges to strip search policies does not govern the reasonableness of a specific application of a prison’s strip search policy. See Watt, 849 F.2d at 198. Here, McCreary has offered credible evidence of a retaliatory strip search, which is not immunized by a general policy authorizing strip searches. See Cooke, 1998 WL 912177, at *3. In addition, neither case relied on by the majority, Elliott v. Lynn, 38 F.3d 188 (5th Cir.1994), and Letcher v. Turner, 968 F.2d 508 (5th Cir.1992), addresses the reasonableness of the initial justification for a strip search. In Lynn, the prisoner “substantially narrow[ed]” the court’s review “by conceding that the scope and justification for the search were not unreasonable.” The inmate in Letcher challenged only the presence of female prison guards during the strip search. 968 F.2d at 510. Here, McCreary express *663 ly contests the initial justification of the search. Moreover, while the majority relies heavily on the supposed parallels between “a food fight [in Letcher] and the potentially provocative barbed words at issue here,” the disturbance in Letcher was more than just “a food fight.” The disturbance there was “an organized food throwing incident, in which a number of inmates threw their food trays, banged on their cell bars, and cursed the guards,” which led to a “lock-down” Letcher, 968 F.2d at 509-10 (emphasis added). Here, the only evidence of any “disturbance” was that McCreary asked two questions of Richardson. Unlike in Letcher, McCreary did not engage in any abusive behavior toward Richardson. While the majority emphasizes that McCreary’s questions might have “provok[ed] a disruption,” they did not.
II.
In sum, on the factual record before us and viewed in the light most favorable to McCreary, there is a genuine issue of material fact as to Captain Richardson’s justification for the strip search and, ultimately, the reasonableness of the search under clearly established law. Summary judgment was, therefore, improper on McCreary’s Fourth Amendment claim.
I respectfully dissent.

. Admittedly, McCreary also did not submit supporting affidavits. However, he testified to his version of the incident at the Spears hearing (for which Richardson appears not to have been present). (See R. at 147-48.) Furthermore, McCreary was representing himself pro se and, as a prisoner, he is severely limited in his ability to interview witnesses, obtain affidavits, or otherwise investigate his claim. Captain Richardson is not so limited.